NURSING HOME PENSION FUND, LOCAL 144; UCFW Local 56 Retail Meat Pension Fund; Drifton Finance Corporation; Robert D. Sawyer; Oleg

Alex Trepetin; Thomas Wright; Dzung Chu; Ryan Kuehmichel; Misop Lessard; Ke Wan, Plaintiffs-appellants,

v.

ORACLE CORPORATION; Lawrence J. Ellison; Jeffrey O. Henley; Edward J. Sanderson, Defendants-appellees,

v.

State Derivative Actions Judicial Council Coordination Proceeding No. 4180, Plaintiff-intervenor.

No. 03–15883.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 2004.

Filed Sept. 1, 2004.

Before: FERGUSON, REINHARDT, and PAEZ, Circuit Judges.

FERGUSON, Circuit Judge:

A number of purchasers of Oracle Corporation stock (collectively referred to as "Plaintiffs") appeal the District Court's dismissal under Rule 12(b)(6) of their revised second amended complaint ("the Complaint") against Oracle Corporation and three of its top executive officers (collectively referred to as "Oracle" or "Defendants"). Plaintiffs' Complaint alleged that Defendants violated section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, promulgated thereunder. Plaintiffs further alleged that Oracle is liable under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).

On appeal, Plaintiffs contend that the District Court erred in dismissing their Complaint because the Complaint set forth allegations that raised a strong inference of scienter, as required by the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b). Plaintiffs also contend that the District Court erred in ruling that certain statements contained in analyst reports were not actionable.

Sanford Svetcov, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP, San Francisco, CA, for the plaintiffs-appellants.

Donald M. Falk, Mayer, Brown, Rowe & Maw, Palo Alto, CA, for the defendants-appellees.

## BACKGROUND

Oracle designs and markets computer software that enables businesses to manage information. It is the second-largest software company in the world, and, since the 1980s, has been the market leader in the arena of database management systems. Plaintiffs allege that by the year

2000, however, the database market had become substantially saturated.

In the late 1990s, Oracle developed the 11i Suite, which was designed to permit businesses to manage their financial, manufacturing, sales, logistics, e-commerce, and supplier information without having to purchase and integrate separate software from different vendors. According to Oracle, the benefit to customers of the 11i Suite was that "it's like Lego blocks. Once you have one piece in, the other pieces just snap together. There's no systems integration required."

Plaintiffs allege that Oracle released the 11i Suite in May 2000 without sufficient technical development and that numerous defects in the program soon became apparent. Around the same time, the national economy began to decline. Plaintiffs allege that growing customer awareness of the defects in the 11i Suite and the declining economy had hurt Oracle's sales by the second quarter of Oracle's fiscal year (September 1–November 30, 2000), but that Oracle covered up its losses by creating phony sales invoices and improperly recognizing past customer overpayments as revenue. Because of this alleged cover-up, Oracle was able to report revenues of $2.66 billion as well as earnings of eleven cents per share, rather than the 8.5 cents per share that Oracle allegedly actually earned. Oracle's second quarter report came out on December 14, 2000, and Oracle's stock price rose from $27.50 on December 14 to $32 on December 18.

Oracle predicted that, in the third quarter of its fiscal year, it would earn twelve cents per share and have revenues of $2.9 billion. It also predicted that applications sales (*i.e.,* sales of the 11i Suite) would grow 75% and that database sales would grow 25%. Moreover, during the Class Period, December 15, 2000–March 1, 2001, Oracle made several statements that it would achieve its growth estimates be-cause the 11i Suite was functioning well, a strong number of sales were in the "pipe-line" in the United States, Europe, and Asia, and the declining U.S. economy was not affecting Oracle's overall performance. For example, Executive Vice President and Chief Financial Officer Jeffrey Henley said in a radio interview on December 15 that "the economy right now even though it's slowing doesn't seem to be affecting us. We see no difference in demand for our upcoming third fiscal quarter," and Lawrence Ellison, Chief Executive Officer of Oracle, was quoted as saying, "The economic slowdown isn't hurting Oracle ... because the company has spent the past three years updating its product line to focus on software that helps companies use the internet to cut costs and boost efficiency." On January 8, 2001, Executive Vice–President Edward Sanderson reportedly told analysts at Salomon Smith Barney that Oracle was seeing "robust demand for both its database and applications businesses ... Oracle says it is also seeing sustained demand for its database product, despite industry-wide concern over contracting IT budgets." Oracle spokeswoman Stephanie Aas told reporters that, as of January 11, 2001, "Oracle has yet to see any sign that its business is being hurt by the economic slowdown or reported cuts to information-technology budgets." Further, analysts reported that, on February 7, Oracle management was "not seeing the effects of a slowing economy at this point," and was not changing its third-quarter forecasts. Two days later, Oracle spokeswoman Jennifer Glass reiterated that Oracle had not changed its projections and said that the "slowdown is going to provide new opportunities for Oracle as companies need to streamline and be more strategic about the technology they buy."

Between January 22 and January 31, 2001, Ellison sold more than 29 million shares of Oracle stock for almost $900

million. It was the first time he had sold Oracle shares in five years. Twenty-three million of the shares were options that Ellison had acquired for 23 cents per share; he sold the stock for $30–32 per share. Chief Financial Officer Jeff Henley sold one million shares of Oracle stock on January 4 for $32 per share; he had paid between $1.04 and $1.69 for the shares.

On March 1, 2001, approximately one month after Ellison's stock sales, Oracle revealed that it would earn only ten cents per share and would post revenues of only $2.67 billion in the third quarter. It also reported that applications sales would grow significantly less than predicted, and that database sales would show either flat or negative growth. The next day, Oracle stock prices fell from $19.50 to $16.88. Plaintiffs allege that Oracle had known much earlier in the quarter that its sales were declining due to the slowing economy and the 11i Suite defects and that it would not meet its growth estimates.

The first complaint was filed by Local 144 Nursing Home Pension Fund on March 9, 2001. Following certification and consolidation of related actions, Plaintiffs filed a consolidated class action complaint against Oracle alleging violations of section 10(b) of the 1934 Act and Rule 10b–5 on August 3. Plaintiffs also alleged that Oracle was liable under section 20(a) of the 1934 Act.

A series of dismissals and filings of amended complaints ensued until, on March 24, 2003, the District Court granted Oracle's motion to dismiss Plaintiffs' revised second amended complaint (the operative "Complaint") with prejudice for failure to state a claim under Fed.R.Civ.P. 12(b)(6) because the pleadings did not meet the heightened pleading requirements of the PSLRA.

Plaintiffs filed timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291.

## LEGAL STANDARDS

A dismissal for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is reviewed de novo. *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir.2001). The general rule for 12(b)(6) motions is that allegations of material fact made in the complaint should be taken as true and construed in the light most favorable to the plaintiff. *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir.2000). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle him or her to relief. *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir.2000).

Section 10(b) states, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use ... of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §§ 78j, 78j(b).

Rule 10b–5 is the regulation promulgated under Section 10(b). 17 C.F.R. § 240.10b–5. It provides that it is unlawful to use any facility of the national securities exchange "[t]o employ any device, scheme, or artifice to defraud." *Id.* § 240.10b–5(a). It further provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* § 240.10b–5(b).

Rule 9(b) imposes a particularized pleading requirement on a plaintiff alleging fraud or any claim premised on fraud. Fed.R.Civ.P. 9(b). In addition, this action is brought under the PSLRA, which amended the 1934 Act to apply a heightened pleading standard to private class actions. *See, e.g.,* 15 U.S.C. § 78u–4(a)(1); *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 973 (9th Cir.1999).

■ To avoid dismissal under the PSLRA, the Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b)(1). If a plaintiff fails to plead the alleged misleading statements or omissions or the defendant's scienter with particularity, the complaint must be dismissed. § 78u 4(b)(3)(A). In addition, the PSLRA requires that the Complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter. § 78u–4(b)(2). The required state of mind is one of "deliberate recklessness." *Silicon Graphics,* 183 F.3d at 975. "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977.

■ In assessing whether Plaintiffs have sufficiently pled scienter, we must consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.,* 320 F.3d 920, 938 (9th Cir.2003). In determining whether a strong inference of scienter exists, we must consider all reasonable inferences, whether or not favorable to the plaintiff. *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002).

## DISCUSSION

■ The District Court agreed with Plaintiffs that Oracle's forecasts regarding the third quarter (*i.e.,* that the declining U.S. economy was not hurting its business and that Oracle would earn twelve cents per share and would see applications revenues grow 75% and database revenues grow 25%), as well as Oracle's statements that the 11i Suite is "pre-integrated and fully interoperable out of the box" and that "no systems integration is required," were actionable. However, the District Court held that the allegations in the Complaint did not create a strong inference that these statements were known to be false when made. We hold that the allegations in the Complaint did create such an inference.

The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement. Past securities fraud litigants have relied on the fact that corporations typically produce internal reports, and have alleged that such reports contained negative information without ever having seen any particular documents. *See In re Silicon Graphics,* 183 F.3d at 984 (noting that the District Court had taken judicial notice of five other securities class action complaints containing the same boilerplate allegations of "negative internal reports" found in the complaint at hand). At its worst, this strategy allowed plaintiffs to bring securities fraud suits with little more basis than the fact that the stock price had fallen. We have held that "a proper complaint which purports to rely on the existence of internal

reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Id.* at 985.

Here, Plaintiffs allege that Oracle maintained an internal database covering global information about sales of Oracle products and services. According to the Complaint, Sanderson said:

> [I]n the sales area, in the sales automation area, I can now—Larry [Ellison] can look at, for example, our forecast on a global basis, our forecast around the world up to the minute at any level of detail that you want to see ... now I can see every deal out there that my reps around the world are working.

Ellison is quoted as saying, "All of our information is on one database. We know exactly how much we have **sold** in the last hour around the world," (emphasis in original). Plaintiffs allege that, since all sales information was in this database, and since the top executives admit to having monitored the database, Oracle must have been aware that it was not going to meet its sales projections earlier in the third quarter, and that its statements to the contrary were therefore made with scienter.

At first glance, these allegations might seem comparable to those made in *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir.2002). There, plaintiffs alleged that defendant corporation PathoGenesis "could regularly track its sales data" and that the company "tracked patient demand using data provided by IMS [Health, an information vendor, which] indicated that patient demand was flat." *Id.* at 1035–36. We held that such allegations were insufficient to plead scienter under the PSLRA because, although "plaintiffs referr[ed] to the exis-

tence of the IMS data and ma[d]e a general assertion about what they think the data show[ed]," they had no hard numbers or other specific information. *Id.* at 1036.

By contrast, Plaintiffs here have hard numbers and make specific allegations regarding large portions of Oracle's sales data. The Complaint contains specific statements from former employees and managers in various regions of the United States (and working in a number of different departments) testifying to a major slowdown in sales. For example, an account manager for the western United States said that "by the summer 2000, the telephones in General Business West 'went dead.' " A former vice president of finance stated that, on the basis of information available to them, the defendants would have known at least six weeks prior to the end of the third quarter that the applications sales growth would miss projections by at least 50%. An Atlanta-based staff consultant reported a severe slowdown of consulting work in the Southeast.

Although Oracle has more than 7,000 salespeople located in sixty different countries, the United States accounts for approximately half of Oracle's annual revenue, which typically exceeds $10 billion. Plaintiffs' witnesses' evaluations of Oracle's financial health in the United States thus offer a substantial window into the overall financial health of the corporation.[1] In combination with the remaining allegations in the Complaint, these statements create a strong inference of scienter.

To begin with, a number of large deals were either lost or delayed early in the third quarter. Four of those deals alone

---

**1.** The Plaintiffs' failure to present detailed information about Oracle's business outside the United States is not fatal to their claim because the defendants specifically represented that the declining U.S. economy would have

no effect on the company's sales. They never qualified these statements by asserting that whatever effect the declining U.S. economy had on their projections would be offset by growth elsewhere in the world.

would have totaled up to $186 million. These deals account for nearly 75% of the total third-quarter shortfall. It was clear by December 2000 and January 2001 that these deals had either fallen through entirely or would not take place during the third quarter. It is reasonable to believe that Oracle had known, prior to its March 1 report, that it would not reach its projected earnings, particularly since Ellison acknowledged that "I was involved in an awful lot of these deals."

Second, between January 22 and January 31, 2001, in his first stock sales in five years, Ellison sold more than twenty-nine million shares of Oracle stock for almost $900 million; Henley sold one million shares of Oracle stock on January 4 for $32 per share. Stock trades are only suspicious when "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986.

To evaluate suspiciousness of stock sales, we consider, *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history. *Id.* Ellison sold a large amount of stock: 29 million shares of Oracle stock worth almost $900 million in total. In holding that Ellison and Henley's stock sales were not suspicious, however, the District Court noted that Ellison sold only 2.1% of his holdings, and Henley sold 7%.

Ellison's stock sale presents a novel situation: few others could sell $900 million worth of stock and only sell 2.1% of their holdings. In the past, we have given great weight to the percentage of stock sold. *See, e.g., Am. West,* 320 F.3d at 939 ("Most of the individuals sold 100% of their shares, with the lowest percentage being 88%. The proceeds from these sales totaled over $12 million."); *Silicon Graphics,* 183 F.3d at 987 ("All but two of the offi-

cers in this case sold a relatively small portion of their total holdings."). However, where, as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings.

The timing of the stock sales is also suspicious. Ellison sold his shares between January 22 and January 31, 2001, approximately one month prior to the March 1 report of lower-than-expected sales. Henley had sold his shares on January 4. Moreover, while there are no allegations with regard to Henley's prior trading history, the Complaint alleges that Ellison had not sold any of his Oracle stock for five years. This makes Ellison's January 2001 trades highly inconsistent with his prior trading history. Taken together, these factors cast suspicion on the stock trades and support a strong inference of scienter.

Third, in a March 15 conference call, Henley stated:

> [A]ll of the decline was primarily centered in the U.S. and the Americas.... The dot-coms played some part in this. But we knew going into the quarter, we had a big database comparison issue and we knew that the dot-com segment was slowing down. I think in hindsight the dot-com ended up a bit worse than we thought. But we certainly anticipated—what we didn't realize—the filling factor, you know, obviously was the economy.

Oracle has also admitted, in the course of securities fraud litigation based in Delaware, "that, as with all software, Oracle's 11i Suite required certain patches and bug fixes, including consolidated patches." On March 15, 2001, Ellison admitted that he was heavily "involved in an awful lot of those deals" that fell through in the third quarter. We may reasonably infer from these admissions that, even as it was mak-

ing optimistic statements to the public, Oracle had known that it would not make its third quarter sales projections due to declining sales to dot-com businesses and defects in the 11i Suite.

Finally, and very importantly, there are the improper revenue accounting records. Oracle maintained a debit account containing money that customers had inadvertently overpaid to Oracle. On November 17, 2000, Oracle created more than 46,000 invoices ("debit memos") in an effort to "clean up" the account. Plaintiffs allege that Oracle credited the amount of the debit memos as revenue, thereby artificially inflating the amount of revenue reported on December 14 at the end of the second quarter.

The District Court took issue with two aspects of this allegation. First, the District Court believed that Plaintiffs had not pled sufficient basis for their belief that the money was in fact recognized as revenue. Second, the District Court believed that there was no strong inference that the defendants in this case knew of any alleged accounting improprieties. The facts pleaded are otherwise.

The Complaint alleges that one of Plaintiffs' expert witnesses, a former financial analyst for a recovery, audit, and cost-containment firm who had reviewed the billing and payment histories of some of Oracle's customers and spoken with Oracle employees regarding customer overpayments, asserted that the "financial impact" of the debit memos "was the same as the creation of an actual invoice for a real product sale." For example, one debit memo was for the amount of $15,582.55; the expert told Plaintiffs that the Oracle records reveal that the pharmaceutical company Eli Lilly had overpaid $15,582.55 to Oracle in 1997 and that Oracle had never refunded the money. When the expert asked an Oracle Credit Analyst about the debit memo, the Credit Analyst told

her that it was not an invoice for a real sale, that no money was due from Lilly, and that the debit memo had been cleared or satisfied by $15,582.55 that had been "on reserve." In other words, Oracle "booked the $15,582.55 as revenue." Plaintiffs offer as corroboration a report from a former Oracle senior manager who was in charge of all customer collections activity in the Americas. He told Plaintiffs that the creation of the debit memos "resulted in $230 million being improperly recognized as revenue"; the witness "further disclosed that ... he voiced his concerns to his superiors ... about recognizing revenue on the basis of customers' unapplied cash."

The Second Circuit has held that personal sources of information relied upon in a complaint should be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000) (permitting personal sources to go unnamed in a complaint so long as their positions are adequately described). Although the Complaint describes the witnesses with sufficient particularity to establish that they were in a position to know Oracle's accounting practices, more importantly, the documents themselves appear to establish improper revenue adjustment. Each of the debit memos lists a "credit" in the amount of the overpayment and clearly states "Revenue" at the start of the line item. Each of the credit line items offsets a debit of the same amount that is identified as a "Receivable," which reveals that the funds apparently moved from the receivable to the revenue account. In other words, the amounts were improperly recognized as revenue. Additionally, Oracle's SEC filings report approximately $215 million less "Customer advances and unearned revenue" in the

second quarter than in the first quarter. The Plaintiffs' statistical expert had calculated that the total amount of money covered by the debit memos would be $228 million, a difference of only $13 million. It is reasonable to infer that the $215 million difference was attributable to improper revenue adjustment.

The District Court believed that the only evidence of scienter with regard to the allegedly improper accounting maneuvers was the top executives' micro-management of Oracle operations. Citing to *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 (9th Cir.2002), the District Court held that mere allegations of a "hands-on" management style were insufficient to establish the strong inference of scienter required by the PSLRA. However, unlike in *Vantive*, Plaintiffs allege specific admissions from the three top executive officers of Oracle. For example, they allege that CEO Ellison said, "I love getting involved in every detail of the business," and that all three top executives said that they monitored portions of Oracle's global database. It is reasonable to infer that the Oracle executives' detail-oriented management style led them to become aware of the allegedly improper revenue recognition of such significant magnitude that the company would have missed its quarterly earnings projection but for the adjustments.

Considered separately, Plaintiffs' allegations may not create a strong inference of scienter. However, we must consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Am. West*, 320 F.3d at 938. We find that the totality of the allegations does create a strong inference that Oracle acted with scienter, and we reverse the District Court.

The District Court also held that four of the statements alleged in the Complaint to be false were paraphrased and so not pled with sufficient particularity. Rather than indicating what the defendants themselves said, the statements were an analyst's interpretation of what the defendants actually said during an interview. For example, after a visit from Sanderson, analysts for Salomon Smith Barney reported, "Oracle sees robust demand for both its database and applications business. Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and scheduling, CRM, and SCM products are also doing well."

The District Court relied on *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1246 (N.D.Cal.1998), in holding that the Complaint must provide direct quotations from the defendants rather than analysts' paraphrasing. However, in *Wenger*, the plaintiffs did not quote analysts but instead did their own "repackag[ing of] defendants' actual oral statements in vague and impressionistic terms." *Id.* Here, Plaintiffs do not repackage Oracle's statements themselves; nor do the analysts they quote appear to have re-framed Oracle's statements "in vague and impressionistic terms." Indeed, Oracle acknowledges that the analysts' reports "simply repeat" other statements at issue in this litigation that were quoted directly.

The cases cited by Oracle are also inapt. Both *In re Harmonic, Inc. Securities Litigation*, 163 F.Supp.2d 1079 (N.D.Cal.2001), and *Plevy v. Haggerty*, 38 F.Supp.2d 816 (C.D.Cal.1998), address projections made by third parties, not statements (including forecasts) made by defendants and communicated via third parties. The cases state that, where third parties make such forecasts, defendants are not liable unless they "put their imprimatur" on the projections. *Harmonic*, 163 F.Supp.2d at 1094–

95; *Plevy,* 38 F.Supp.2d at 823. Here, the statements clearly originated from Oracle and were merely reported by the third parties.

■ Consequently, when statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held to be actionable even if they are not exact quotations.

## CONCLUSION

The PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance. This is far from a cookie-cutter complaint. Together, the false representations, both as to current facts and future estimated profits and sales, as well as the improper revenue adjustment and unusual stock sales, provide a basis for the cause of action against Oracle and each of its three top executives. We reverse the District Court's dismissal of the Complaint.

**REVERSED AND REMANDED.**