**STREAMCAST NETWORKS, INC., Plaintiff,**

v.

**SKYPE TECHNOLOGIES, S.A., et al., Defendants.**

**No. CV 06–391 FMC (Ex).**

United States District Court, C.D. California.

Jan. 19, 2007.

Charles S. Baker, David L. Burgert, Eric D. Wade, Porter and Hedges, Houston, TX, Daniel J. Woods, Gary S. Sedlik, Matthew P. Lewis, White & Case, Los Angeles, CA, for Plaintiff.

Benjamin F. Chapman, Joseph S. Leventhal, Michael G. Rhodes, Philip C. Tencer, Cooley Godward Kronish, San Diego, CA, Lance A. Etcheverry, Peter Bradley Morrison, Thomas J. Nolan, Skadden Arps Slate Meagher and Flom, Mark A. Albert, Roderick G. Dorman, Hennigan Bennett & Dorman, Los Angeles, CA, James A. Sedivy, Jeffrey P. Alpert, Jeffrey F. Gersh, Gershkaplan, Encino, CA, for Defendants.

ORDER GRANTING MOTION #1 OF DEFENDANTS NIKLAS ZENNSTROM, SHARMAN NETWORKS, LTD., KEVIN BERMEISTER, BRILLIANT DIGITAL ENTERTAINMENT, INC., JOLTID LTD., JOLTID OU, LA GALIOTE, B.V., AND INDIGO INVESTMENTS, B.V. TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

FLORENCE–MARIE COOPER, District Judge.

This matter is before the Court on Defendants Niklas Zennstrom, Sharman Networks, Ltd., Kevin Bermeister, Brilliant Digital Entertainment, Inc., Joltid Ltd., Joltid OU, La Galiote, B.V., and Indigo Investments, B.V.'s Motion (#1) to Dismiss Plaintiff's Second Amended Complaint (docket no. 155), filed on December 4, 2006. The Court has read and considered the moving, opposition and reply documents submitted in connection with the Motion. The Court deems this matter appropriate for decision without oral argument. *See* Fed.R.Civ.P. 78; Local Rule 7–15. Accordingly, the hearing set for January 22, 2007 is removed from the Court's calendar. For the reasons and in the manner set forth below, Defendants' Motion is GRANTED, with prejudice.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff, StreamCast Networks, Inc. ("StreamCast") seeks relief for injuries ansing out of Defendants' purported orchestration of "an elaborate over-seas shell game in an attempt to steal and wrongfully profit from technology that rightfully belongs to StreamCast." Second Amended Complaint ("SAC") ¶ 1. StreamCast alleg-

---

1. Additional discussion of the factual allegations supporting StreamCast's causes of action is contained in the Court's September 14, 2006 Orders addressing Defendants' motions to dismiss the First Amended Complaint.

es that, on or about March 22, 2001, it entered into a license agreement with Defendant Kazaa, B.V. ("Kazaa") for the rights in and to a peer-to-peer ("P2P") software application known as FastTrack. *Id.* ¶¶ 26, 30. In or about April 2001, StreamCast began distributing the Fast-Track software to the public under the brand name "Morpheus," which allowed end users to search for, find, and download almost any type of digital file over the Internet. *Id.* ¶ 31.

StreamCast continued to operate the Morpheus FastTrack network with great success until February 25, 2002, when Defendant Kazaa and others, acting pursuant to a premeditated plan, allegedly activated a hidden "disabling" feature within the FastTrack software, effectively shutting down the network. *Id.* ¶¶ 34–35, 45. Overnight, StreamCast's entire Morpheus user base of over 28 million people was "tunneled" to Defendant Sharman Networks, Ltd. ("Sharman Networks"), which had recently acquired the FastTrack P2P technology from Kazaa. *Id.* ¶¶ 43, 46.

StreamCast alleges that the transfer of the FastTrack technology from Kazaa to Sharman Networks occurred in violation of a provision in the March 22, 2001 license agreement providing StreamCast with a right of first refusal in the purchase of FastTrack and/or any other assets of Kazaa. *Id.* ¶¶ 29–30, 43. StreamCast further alleges that the resultant increase in the Sharman Networks/Kazaa user base created a "networks effect" momentum "that no other P2P market, company, technology or network was able to match," such that Sharman Networks/Kazaa "achieved undeniable world dominance of the file-sharing market." *Id.* ¶¶ 49–50.

In an attempt to revive its Morpheus network and regain its former market share, StreamCast promptly searched for a new (non-FastTrack) file-sharing program. *Id.* ¶ 51. It eventually settled on "Gnutella," which used a "broadcast query algorithm rather than super nodes," making it slower to respond to user searches than FastTrack. *Id.* Although many users returned to Morpheus upon its re-launch (in March 2002), they quickly became frustrated and "swung away" to Kazaa or "later new entrants." *Id.* ¶ 52.

StreamCast continued to operate the Morpheus network using Gnutella, albeit with fewer users, until February 2004, when it added the ability for its users to also connect to the eDonkey and G2 P2P networks. *Id.* ¶ 56. In September of 2004, it acquired a new P2P file-sharing technology platform based upon a technology called Skyris, that allowed users to connect to Gnutella, eDonkey, G2 and a new "Neo Network." *Id.* As a result of this effort, StreamCast has been able to re-build its Morpheus user base back up to 6 million unique monthly users. *Id.* ¶ 57.

In the interim, Defendants Zennstrom and Friis, with assistance from Defendant Bermiester and unknown others, formed a Luxembourg company called Skype Technologies ("Skype"). *Id.* ¶ 60. These same individuals then orchestrated a transfer of the "source code" and "core" FastTrack technology to Skype, which Skype adapted to offer internet-based voice communications ("VoIP") services to consumers worldwide. *Id.* ¶¶ 59–61.

On September 5, 2005, eBay, Inc. ("eBay") purchased Skype for a price in excess of $4.1 billion. *Id.* ¶ 63. Shortly thereafter, on January 20, 2006, SteamCast filed its Original Complaint in this action for (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) breach of contract; (3) civil conspiracy; (4) unfair competition (Cal. Bus. & Prof.Code § 17200 et seq.); (5) fraudulent transfer under Cal. Civ.Code § 3439.01 et seq.; (6) unjust enrichment;

(7) constructive trust; (8) declaratory judgment; (9) interference with contract; (10) interference with prospective economic advantage; and (11) conversion. The following individuals and entities were named as Defendants: (1) Skype Technologies, S.A.; (2) Niklas Zennstrom; (3) Janus Friis; (4) Kazaa, B.V.; (5) Joltid, Ltd., (6) Joltid OU; (7) Blastoise, Ltd.; (8) Bluemoon OU; (9) LA Galiote, B.V.; (10) Indigo Investments, B.V.; (11) Brilliant Digital Entertainment, Inc.; (12) Sharman Networks, Ltd.; (13) Kevin Bermiester; and (14) John Does 1–10 inclusive.

Streamcast filed a First Amended Complaint ("FAC") on May 22, 2006, adding additional Defendants Mark Dyne; Altnet, Inc.; Fasttrack, B.V.; Consumer Empowerment, B.V.; Murray Markiles; LEF Interactive PTY, Ltd.; Eurocapital Advisors, LLC; and Nicole Hemming. The FAC also added new causes of action for (1) violation of the RICO; (2) conspiracy to restrain trade in violation of § 1 of the Sherman Act and §§ 4 and 16 of the Clayton Act; and (3) conspiracy to monopolize, attempt to monopolize and monopolization in violation of § 2 of the Sherman Act and §§ 4 and 16 of the Clayton Act.

On September 14, 2006, the Court issued three separate Orders addressing various Defendants' motions to dismiss. First, the Court Granted Defendants Mark Dyne, Murray Markiles, and Altnet, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint on Statute of Limitations Grounds, thereby dismissing StreamCast's First through Fourth and Sixth through Fourteenth causes of action against said Defendants. Second, the Court Granted in Part and Denied in Part Defendants Brilliant Digital Entertainment, Inc. and Kevin Bermeister's Motion to Dismiss, dismissing StreamCast's Sixth (civil conspiracy), Ninth (unjust enrichment), Tenth (constructive trust), Twelfth (intentional interference with contract), Thirteenth (intentional interference with prospective economic advantage) and Fourteenth (conversion) causes of action against said Defendants. Finally, pursuant to the Court's Order Granting Defendants Mark Dyne, Murray Markiles, Kevin Bermeister, Brilliant Digital Entertainment, Inc. and Altnet, Inc.'s Motion to Dismiss Plaintiffs First Amended Complaint under Fed.R.Civ.P. 12(b)(6), StreamCast's First and Second claims for relief under the RICO were dismissed with prejudice as to Defendants Bermeister and Brilliant Digital Entertainment, Inc. Concomitantly, StreamCast was granted leave to amend its antitrust claims (Third and Fourth causes of action), to allege, if possible "the existence of a relevant geographic and product market in which trade was unreasonably restrained or monopolized."

On November 2, 2006, StreamCast filed the SAC, asserting all fourteen of its prior causes of action against various combinations of the remaining nineteen Defendants, consistent with the Court's September 14, 2006 Orders.[2] By means of the

2. In the interest of judicial economy, StreamCast and Defendants have stipulated that the Court's September 14, 2006 Orders shall apply to newly-served Defendants Joltid Ltd., Joltid OU, Indigo Investments, B.V., La Galiote, B.V., Sharman Networks, Inc. and Niklas Zennstrom as if these Defendants had joined in the prior motions addressed thereby. *See* Stipulation and Order Applying Court's Orders Dated September 14, 2006 to Newly Served Defendants, December 4, 2006; Stipulation and Order Continuing Responsive Pleading Date to Second Amended Complaint and Establishing Briefing Schedule on Responsive Motions and Applying Court's Orders dated September 14, 2006 to defendant Joltid OU, December 7, 2006. Accordingly, the only claims remaining against these Defendants are the Third and Fourth claims for relief (antitrust), the Seventh claim for relief

instant motion, Defendants Niklas Zennst-rom, Sharman Networks, Ltd., Kevin Bermeister, Brilliant Digital Entertainment, Inc., Joltid Ltd., Joltid OU, La Galiote, B.V., and Indigo Investments, B.V. (hereinafter "Moving Defendants") seek to dismiss the Third and Fourth (antitrust) causes of action on the grounds that Plaintiff has failed to rectify the pleading defects identified in the Court's prior order and/or has otherwise failed to state a claim upon which relief can be granted. They further request that the Court decline to exercise supplemental jurisdiction over the remaining state law claims.

### STANDARD OF LAW

Rule 12(b) (6) of the Federal Rules of Civil Procedure permits a defendant to seek dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The Court will not dismiss claims for relief unless the plaintiff cannot prove any set of facts in support of the claims that would entitle him to relief. *Thompson v. Davis,* 295 F.3d 890, 895 (9th Cir.2002); *see also Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295 (9th Cir.1998). All material factual allegations in the complaint are assumed to be true and construed in the light most favorable to the plaintiff. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1229 (9th Cir.2004) ("The general rule for 12(b)(6) motions is that allegations of material fact made in the complaint should be taken as true and construed in the light most favorable to the plaintiff.") (citing *Burgert v.*

*Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 663 (9th Cir.2000)). However, the Court "is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot be reasonably drawn from the facts alleged." *Clegg v. Cult Awareness Network,* 18 F.3d 752, 755 (9th Cir.1994) (internal citations omitted).

If the Court dismisses the complaint, it must decide whether to grant leave to amend. Denial of leave to amend is "improper unless it is clear that the complaint could not be saved by any amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 403 F.3d 1050, 1055 (9th Cir.2005). However, the district court's discretion to deny leave to amend is decidedly broader where the plaintiff has previously filed an amended complaint. *Miller v. Yokohama Tire Corp.,* 358 F.3d 616, 622 (9th Cir.2004) ("Where the plaintiff has previously filed an amended complaint, as Miller has done here, the district court's discretion to deny leave to amend is 'particularly broad.' ").

### DISCUSSION

**I. Whether StreamCast States Claims for Relief Under the Sherman and Clayton Acts[3]**

Moving Defendants argue that StreamCast's claims for Defendants' alleged violations of sections 1 and 2 of the Sherman Act are defective for three independent reasons: (1) StreamCast still fails to adequately allege/identify a legally cognizable "relevant product market"; (2) Stream-

(unfair competition), the Eighth claim for relief (California Fraudulent Transfer Act) and the Eleventh claim for relief (declaratory judgment).

**3.** While the Sherman Act provides the substantive basis for StreamCast's antitrust claims, the Clayton Act supplies a private

right of action therefor. *See Glen Holly Entm't, Inc. v. Tektronix Inc.,* 352 F.3d 367, 371 (9th Cir.2003) ("This law [section 4 of the Clayton Act] effectively allows private persons to sue for antitrust violations previously restricted by statute to government enforcement.").

Cast fails to allege that Defendants have the requisite market power to unreasonably restrain trade or possess a monopoly; and (3) StreamCast lacks "antitrust standing" because it fails to plead any "antitrust injury." *See* Mot at 7. The Court agrees that StreamCast's amended pleading continues to fall short of stating any actionable antitrust causes of action, for the reasons discussed in detail below.

### A. Market Definition

■■ As set forth in the Court's prior order, Section 1 of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 1. "In order to establish a claim under Section 1, a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *Tanaka v. Univ. of S. Cal.,* 252 F.3d 1059, 1062 (9th Cir.2001).

■ As the Supreme Court recently explained, *"[p]er se* liability is reserved only for those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.' " *Texaco Inc. v. Dagher,* 547 U.S. 1, 126 S.Ct. 1276, 1279, 164 L.Ed.2d 1 (2006) (quoting *National Soc. of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)). Accordingly, the Court "presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and unlawful." *Id.* (citations omitted). Under a rule of reason analysis, the plaintiff "bears the initial burden of showing that the restraint

produces 'significant anticompetitive effects' within a 'relevant market.' " *Tanaka,* 252 F.3d at 1064 (quoting *Hairston v. Pacific 10 Conf.,* 101 F.3d 1315, 1319 (9th Cir.1996)).

■■ Market analysis is also essential to StreamCast's monopolization claim under Section 2, which requires proof of (1) Defendants' possession of monopoly power in the relevant market and (2) Defendants' willful acquisition or maintenance of such power. *See Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1373 (9th Cir.1989) ("[D]efining the relevant market is indispensable to a monopolization claim."); *see also Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995) ("Market definition is crucial. Without a definition of the relevant market, it is impossible to determine market share."). Accordingly, "failure to identify a relevant market" is a proper ground for dismissal of both of StreamCast's Sherman Act claims. *See, e.g., Tanaka,* 252 F.3d at 1063 ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.") (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1105 (9th Cir.1999)); *see also N. Am. Energy Sys., LLC v. New Eng. Energy Mgmt.,* 269 F.Supp.2d 12, 16 (D.Conn.2002) ("A plaintiff claiming a violation of §§ 1 and 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized."); Earl W. Kintner, 2–10 Federal Antitrust Law § 10.16 (Matthew Bender 2005) ("In rule of reason cases, and any Section 2 case requiring proof of market power, the plaintiff bears the burden of pleading a relevant market.").

■■ The "relevant market" includes " 'notions of geography as well as product use, quality and description.' " *Tanaka,* 252 F.3d at 1063 (quoting *Oltz v. St. Pe-*

*ter's Cmty. Hosp.,* 861 F.2d 1440, 1446 (9th Cir.1988) (quoting *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1218 (9th Cir.1977))). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Olin Corp. v. FTC,* 986 F.2d 1295, 1298 (9th Cir.1993) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)) (footnote omitted); *Oltz,* 861 F.2d at 1446 ("The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand."). "Elasticity of demand is a concept used to signify the relationship between changes in price and responsive changes in demand." *United States v. LSL Biotechnologies,* 379 F.3d 672, 697 (9th Cir.2004); *see also Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 469, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (cross-elasticity of demand refers to "the extent to which consumers will change their consumption of one product in response to a price change in another.").

### 1. Whether The Worldwide Market for Fast Track P2P File–Sharing Services Is An Appropriate Market

StreamCast continues to allege that the "relevant market" in which Defendants' behavior has had anticompetitive/monopolistic effects is "the worldwide market for the provision of FastTrack P2P file-sharing services and the selling of advertising directed to users of such services." SAC ¶¶ 84, 86, 100, 102. In its prior order, the Court faulted StreamCast for "failing to plead facts which establish that P2P file-sharing services using other [non-FastTrack] applications are not 'reasonably interchangeable' with Morpheus (i.e., that they cannot perform the same essential search and file-transfer functions, etc.)," and, concomitantly, for failing to

justify why the relevant market should be limited to FastTrack-based services alone. *See* Order Granting Defendants Mark Dyne, Murray Markiles, Kevin Bermeister, Brilliant Digital Entertainment, Inc. and Altnet, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint Under Fed.R.Civ.P. 12(b)(6), September 14, 2006, at 19. In the SAC, StreamCast has added numerous allegations concerning the purported "uniqueness" of the FastTrack application. However, even when all reasonable inferences are drawn in StreamCast's favor, these allegations continue to fall short of establishing that FastTrack and other P2P technologies are not sufficiently reciprocal to constitute the same product market.

"Courts have consistently refused to consider one brand to be a relevant market of its own when the brand competes with other potential substitutes." *Little Caesar Enters., Inc. v. Smith,* 34 F.Supp.2d 459, 477 (E.D.Mich.1998) (citations omitted); *see also Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 100 F.Supp.2d 1073, 1078 n. 6 (C.D.Cal.1999) ("[C]ourts have usually rejected the claim that one brand is its own market when there are competing brands."). Indeed, the few cases in which courts have acknowledged the possibility of limiting the relevant market to a single brand have involved markets for replacement parts for specific brands of durable goods where consumers are "locked-in" to maintaining them. *See Eastman Kodak Co. v. Image Technical Servs. Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (replacement parts for Kodak copiers); *Glen Holly,* 100 F.Supp.2d at 1078 n. 6 ("For example, replacement parts for Ford cars may be an entirely different market than replacement parts for Chrysler cars."). As one leading treatise points out, courts have been extremely reluctant to embrace

the reasoning of the Supreme Court's decision in *Kodak, supra*, much less to extend it to other types of goods. *See* Kintner, 2–10 Federal Antitrust Law § 10.8.

Here, while StreamCast pleads that FastTrack possesses some unique attributes and components that may make it more attractive and efficient, it still does not (and undoubtedly cannot) plead that other P2P applications and networks do not permit users to accomplish the same basic task of searching for and downloading a variety of media files from the internet. *Compare, e.g., Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir.2000) (Yale education not sufficiently unique to constitute a market distinct from other top universities); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 (3d Cir.1992) ("Plaintiffs do not contend, nor seriously could they, that Chrysler's patents on several car components make Chrysler cars a one-brand market . . . ."); *Global Discount Travel Servs., LLC v. TWA*, 960 F.Supp. 701, 705 (S.D.N.Y.1997) (rejecting market definition of "tickets for travel on TWA [airlines] between certain city pairs" because "[t]ickets on TWA are reasonably interchangeable with tickets on other airlines—all tickets between city pairs get passengers to and from desired locations."). In fact, the SAC contains numerous references to other purveyors of free P2P software (i.e., "brand" competitors of FastTrack/Sharman Networks/Kazaa)—including iMesh, eDonkey, Gnutella, Direct-Connect, FileNavigator, SongSpy, Blubster, Lime Wire, Bearshare, Gnucleus, and XoloX, as well as Morpheus itself, using the new technology platform of Skyris/NEONet. *See* SAC ¶¶ 44, 46, 54, 56. While many users may personally prefer FastTrack's features, there is simply no indication that users are unwilling to "patronize" other networks and/or that they would not switch from FastTrack/Sharman Networks/Kazaa to another provider or network if even the most nominal of fees were charged. *See, e.g., Tanaka*, 252 F.3d at 1063 ("Tanaka's strictly personal preference to remain in Los Angeles is irrelevant to the antitrust inquiry before us"); *Thurman Indus.*, 875 F.2d at 1377 (rejecting goods and services sold at "home centers" as separate product market based on lack of evidence that "consumers are unwilling to patronize a variety of retailers other than home centers in meeting [their home improvement purchasing] needs.").[4]

The fact that StreamCast's Morpheus network has now "recaptured" six million unique monthly users further undermines any argument that consumers do not view other P2P technologies to be reasonably interchangeable with FastTrack. Thus, through its own detailed pleading and admissions, StreamCast has clearly identified a single "market" consisting of numerous "brands" of P2P services and/or technology, each with different quality features. *See, e.g., In re Super Premium Ice Cream Distribution Antitrust Litigation*, 691 F.Supp. 1262, 1268 (N.D.Cal.1988), *aff'd without opinion sub nom Haagen–Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir.1990) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances. Such distinctions are economically meaningless where the differences are actually a spectrum of price and quality differences.") (citing *Brown Shoe*, 370 U.S. at 326, 82 S.Ct. 1502) (additional citations omitted). For this reason, StreamCast's attempts to limit

---

4. In fact, it is technically possible for a user to have more than one P2P file-sharing application on his or her computer at any given time.

the market definition to the worldwide market for the provision of FastTrack P2P file-sharing services continue to fail.[5]

### 2. Whether the Broader Worldwide Market for All P2P File–Sharing Services is An Appropriate Alternative Market

 In the alternative, StreamCast seeks to define the relevant market as the broader worldwide "market for the provision of P2P file-sharing applications and services and the selling of advertising directed to users of such services." *See* SAC ¶¶ 85, 102–103; Opp'n at 13. Although several of the Moving Defendants argued in favor of such a market definition in their prior motion to dismiss the FAC, they now contend that it, too, is overly-narrow. Instead, Defendants insist that "the relevant market is the market for the digital distribution of content online, and not merely a market for the distribution of P2P file sharing software." Mot. at 13. Defendants point to the fact that, in another case currently pending in this district (*Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, CV 01–8541 SVW (FMOx)), StreamCast sought discovery regarding a possible copyright misuse defense, due to plaintiffs' efforts to monopolize "the market for the provision or distribution of music or movies over the Internet." *See* Request for Judicial Notice, Exhibit B.[6]

The Court agrees with StreamCast that the contents of its pleadings in the *Grokster* action are of minimal relevance in the instant case, as the identities of the plaintiffs there are *not* coextensive with those of the defendants here. *See* Opp'n at 13–

15; Plaintiff's Evidentiary Objections to Portions of Motion to Dismiss. Accordingly, there is no reason for the Court to conclude that the relevant market should not be limited to that for P2P file-sharing services. At any rate, further discussion of whether the market should be defined more broadly would be largely academic since, for the reasons discussed immediately below, StreamCast has failed to plead the existence of any "antitrust injury," even within the narrower P2P services market.

### B. Antitrust Injury

 It is well-established that "[c]ausal antitrust injury[ ] is an element of all antitrust suits brought by private parties seeking damages under Section 4 of the Clayton Act." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)); *see also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 122, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) ("We hold that a plaintiff seeking injunctive relief under § 16 of the Clayton Act must show a threat of antitrust injury ...."). "To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Id.* (citation omitted); *see also Pool Water Prods., v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) ("[T]he antitrust laws are only concerned with acts that harm 'allocative effi-

---

5. The Court is unpersuaded by StreamCast's argument that it would benefit from further factual discovery on the issue, as Stream-Cast's own allegations form the primary basis for the Court's holding.

6. The plaintiffs in the *Grokster* action have brought claims for copyright infringement against StreamCast and another provider of P2P "file-sharing" software, Grokster, Ltd. *See, e.g., MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005).

ciency and raise[ ] the price of goods above their competitive level or diminish[ ] their quality.' ") (quoting *American Ad Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir.1999) and citing *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir.1991) (Antitrust injury "means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws.")).

Here, Defendants' alleged transfer of the FastTrack P2P technology out of the hands of StreamCast and Morpheus and into the exclusive control of Sharman Networks (Kazaa) and Skype, even if violative of the provisions of the March 22, 2001 license agreement, did not result in higher prices or decreased output for the consuming public. Instead, as StreamCast concedes, FastTrack and other P2P services remained available to a potentially infinite number of users worldwide, free of charge and with no discernable decrease in quality. *See* Opp'n at 23 (recognizing that, even after Morpheus' demise, "a virtually unlimited number of users could get Kazaa, a FastTrack P2P"); SAC ¶ 50 ("With FastTrack, Kazaa had a superior performing tool that worked better at connecting, finding files and downloading them due to both the design of its technology as well as its huge user base of combined Kazaa and Morpheus consumers.").[7] The mere fact that StreamCast was unable to immediately convert its Morpheus network from FastTrack to another application and, ac-

cordingly, lost users and advertising revenue, is insufficient to establish "antitrust injury." *See, e.g., Rebel Oil*, 51 F.3d at 1433 ("Of course, conduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare."); *see also Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir.2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury.") (citations omitted); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 734 (9th Cir.1987) ("While appellant clearly pleads injury to itself, its conclusion that competition has been harmed thereby does not follow.").[8]

Because consumers retained unlimited, no-cost access to FastTrack and other P2P networks, this case is entirely distinguishable the Supreme Court's decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), on which StreamCast heavily relies. In that case, the defendant's elimination of a competitor's resort from a multi-day, four-resort ski pass adversely affected consumers, in that it led to decreased access to the mountains. *See id.* at 605–06, 105 S.Ct. 2847. Indeed, the Court took pains to explain that "many of the skiers who come to Aspen want to ski the four mountains, and the abolition of the 4–area pass made it more difficult to satisfy that ambition," and that "the 4–

---

**7.** Indeed, these allegations suggest that the "tunneling" of FastTrack users from StreamCast/Morpheus to Sharman Networks/Kazaa actually enhanced consumers' file-sharing experiences.

**8.** The fact that the Sharman Networks/Kazaa FastTrack software may have contained some "negative" features such as "adware" and "spyware" does not alter the Court's analysis, as consumers remained free to patronize other P2P providers and networks, including the

re-launched Morpheus/Gnutella network, to obtain the same ultimate results. That they continued to prefer FastTrack over other "brands" does not indicate that the market was not functioning competitively. *See, e.g., Wallace v. IBM*, 467 F.3d 1104, 1107 (7th Cir.2006) ("When monopoly does not ensue, low prices remain—and the goal of antitrust law is to use rivalry to keep prices low for consumers' benefit.").

area attribute of the ticket allowed the skier to purchase his 6–day ticket in advance while reserving the right to decide in his own time and for his own reasons which mountain he would ski on each day." *Id.*

Alternatively, StreamCast insists that Defendants' actions caused an "antitrust injury" in the form of "injury to innovation." However, this argument is entirely contradicted by the allegations in the SAC that StreamCast itself, in connection with a group of Harvard computer scientists, was able to develop and successfully launch an entirely new P2P file-sharing technology platform and network—i.e., Skyris and NEONet. SAC ¶ 56. StreamCast further alleges that NEONet can now "connect, find files, download them adequately, and do all of this as quickly or more quickly than the FastTrack applications and network...." *Id.* Moreover, StreamCast alleges that there were a number of other "new entrants" to the market in the period after the initial Morpheus shutdown. SAC ¶ 52. Accordingly, the only inference that the Court can draw from StreamCast's pleading is that Defendants' actions actually served to *increase* innovation within the relevant market and to *improve* the quality of consumer choices. For this reason and the others discussed above, StreamCast has failed to allege any cognizable "antitrust injury." [9]

## II. Possibility of Amendment

■ It is clear to the Court that StreamCast's failure to allege an "antitrust injury" cannot be overcome by a grant of leave to amend. While Defendants' actions clearly harmed StreamCast, they did not have any adverse effects on competition or innovation within the relevant market for

the provision of P2P file-sharing services. No additional pleading or discovery will alter this reality. *See, e.g., Rutman Wine,* 829 F.2d at 736 ("[I]f the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust") (internal quotations omitted). Accordingly, the Court concludes that StreamCast's Third and Fourth causes of action should be dismissed with prejudice.

## III. Supplemental Jurisdiction Over Remaining State Law Claims

■ A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3) (2006). Among the factors for the court to consider in "deciding whether to retain jurisdiction over pendent state claims" are (1) economy, (2) convenience, (3) fairness, and (4) comity. *See Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1309 (9th Cir.1992).

■ "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Acri v. Varian Assocs.,* 114 F.3d 999, 1001 (9th Cir.1997) (en banc) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). The Court finds this case to be no exception. Accordingly, the Court declines to exercise supplemental jurisdiction over StreamCast's remaining state law claims.

## CONCLUSION

Based on the foregoing, Defendants Niklas Zennstrom, Sharman Networks,

---

9. Because a lack of "antitrust injury" is fatal to both of StreamCast's Sherman Act claims, the Court does not consider Defendants' additional arguments and requests for judicial notice of evidence regarding Defendants' lack of market power and/or market share.

Ltd., Kevin Bermeister, Brilliant Digital Entertainment, Inc., Joltid Ltd., Joltid Ou, La Galiote, B.V., and Indigo Investments, B.V.'s Motion (# 1) to Dismiss Plaintiff's Second Amended Complaint (docket no. 155) is GRANTED. StreamCast's Third and Fourth (antitrust) causes of action are DISMISSED with prejudice as to said Defendants. The remaining state law claims are DISMISSED without prejudice to their refiling in state court, due to the Court's declination of supplemental jurisdiction.

The following motions, also set for hearing on January 22, 2007, are hereby DENIED as MOOT:

(1) Defendants Niklas Zennstrom, Sharman Networks, Ltd., LEF Interactive Pty, Ltd., Kevin Bermeister, Brilliant Digital Entertainment, Inc., Joltid, Ltd., Joltid, OU, La Galiote, B.V., and Indigo Investments, B.V.'s Motion to Dismiss # 2 (docket no. 127);

(2) Defendant Sharman Networks, Ltd.'s Motion to Dismiss # 4 for Lack of Personal Jurisdiction (docket no. 163);

(3) Defendants Joltid Ltd.'s Motion to Dismiss # 5 for Lack of Personal Jurisdiction (docket no. 129);

(4) Defendants Indigo Investments B.V. and La Galiote B.V.'s Motions to Dismiss # s 6 and 7 for Lack of Personal Jurisdiction (docket no 132); and

(5) Defendant Joltid Oil's Motion to Dismiss # 8 for Lack of Personal Jurisdiction (docket no. 136).

IT IS SO ORDERED.