Michael **ATLAS** and Gail Atlas, individually and on behalf of all others similarly situated, Plaintiffs,

v.

**ACCREDITED HOME LENDERS HOLDING CO.; James Konrath; Joseph J. Lydon; Stuart D. Marvin; John S. Buchanan; David E. Hertzel; and Jeffrey W. Crawford, Defendants.**

**and Consolidated Actions.**

**No. 07–CV–488 H(RBB).**

United States District Court, S.D. California.

Jan. 4, 2008.

David C. Walton, Coughlin Stoia Geller Rudman & Robbins LLP, David A. Thorpe, Blair A. Nicholas, David R. Stickney, Matthew P. Siben, David R. Stickney, Bernstein Litowitz Berger & Grossmann LLP, Daniel J. Mogin, The Mogin Law Firm, Arthur L. Shingler, Scott and Scott, San Diego, CA, Mark I. Labaton, Kreindler and Kreindler, Lionel Z. Glancy, Glancy Binkow and Goldberg, Los Angeles, CA, Evan Jason Smith, Brodsky & Smith, LLC, Beverly Hills, CA, for Plaintiffs.

Edward P. Swan, Jr., Andrea M. Kimball, Luce Forward Hamilton and Scripps, Christopher Harold McGrath, Paul Hastings Janofsky and Walker, San Diego, CA, James P. Gillespie, Kirkland & Ellis LLP, Washington, DC, Joshua G. Hamilton, William F. Sullivan, Paul, Hastings, Janofsky & Walker LLP, Los Angeles, CA, for Defendants.

## ORDER

**(1) DENYING ACCREDITED'S MOTION TO DISMISS; (2) GRANTING IN PART WITH LEAVE TO AMEND ACCREDITED MORTGAGE LOAN REIT TRUST'S AND THE INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS; AND (3) DENYING PLAINTIFF'S MOTION TO STRIKE**

MARILYN L. HUFF, District Judge.

On August 24, 2007, lead plaintiff Arkansas Teacher Retirement System

("Plaintiff" or "ATRS") filed a corrected consolidated class action complaint alleging violations of the federal securities laws. (Doc. No. 54.) On November 2, 2007, defendants Accredited Home Lenders Holding Co. and Accredited Mortgage Loan REIT Trust ("corporate defendants") filed a motion to dismiss Plaintiff's complaint. (Doc. No. 71.) Also on November 2, 2007, defendants James H. Berglund, John S. Buchanan, Jeffrey W. Crawford, Gary M. Erickson, Bowers W. Espy, Jody A Gunderson, James A. Konrath, Joseph J. Lydon, Stuart D. Marvin and Richard T. Pratt ("individual defendants" or, where appropriate, "director defendants" (collectively with the corporate defendants, "Defendants")) filed a motion to dismiss Plaintiff's complaint. (Doc. No. 72.) On December 14, 2007, pursuant to a special briefing schedule, see Doc. No. 78, Plaintiff filed a single response in opposition to defendants' motions to dismiss as well as a response in opposition to defendants' request for judicial notice. (Doc. Nos. 79, 80.) On December 28, 2007, the corporate defendants and individual defendants filed reply briefs in support of their respective motions to dismiss. (Doc. Nos. 84, 85.)

Additionally, on November 6, 2007, all of the above-named defendants filed a joint request for judicial notice in support of the motions to dismiss. (Doc. No. 76.) Plaintiff filed an opposition to Defendants' joint request on December 14,2007. (Doc. No. 80.) Defendants filed a reply on December 28, 2007. (Doc. No. 84.)

Finally, on December 14, 2007, Plaintiff filed a motion to strike certain documents referenced in defendants' motions to dismiss. (Doc. No. 81.) On December 28, 2007, Defendants filed a single brief in opposition to Plaintiff's motion to strike. (Doc. No. 83.)

On December 18, 2007, the Court submitted Defendants' motions to dismiss and Plaintiffs motion to strike. (Doc. No. 82.) Pursuant to its discretion under Local Rule 7.1(d) the Court continues to find these motions appropriate for resolution without oral argument. For the reasons stated below, the Court denies in major part defendants' motions to dismiss.

### Background

For purposes of these motions to dismiss, the Court accepts as true all well-pleaded facts alleged in the Corrected Consolidated Class Action Complaint ("Complaint" or "CCC"). *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). Additionally, the Court as explained below has taken judicial notice of certain documents.

### A. Parties

#### 1. *Plaintiffs*

Court-appointed lead plaintiff Arkansas Teacher Retirement System was established 28 in 1937 to provide retirement benefits to the employees of that State's education community. (CCC ¶ 19.) For the fiscal year ending June 30, 2006, ATRS consisted of 85,916 active members and 24,050 retirees receiving benefits. (*Id.*) ATRS's total assets equaled $11.27 billion. ATRS purchased Accredited common stock, at allegedly inflated prices, between November 1, 2005 and March 12, 2007. (CCC ¶¶ 14, 19.) Plaintiff William F. Kornfeld ("Kornfeld") acquired 561 shares of Accredited common stock in exchange for 6,000 shares of Aames Investment Corp. ("Aames") upon the 2006 acquisition of Aames by Accredited. (*Id.* ¶ 20.) Plaintiff Kornfeld allegedly suffered damages resulting from the manner in which Accredited accounted for its acquisition of Aames. (*Id.* ¶ 7.)

#### 2. *Defendants*

As noted above, Plaintiffs Complaint names as defendants two corporate enti-

ties—Accredited and its indirect subsidiary the REIT—and several individuals.

Accredited is a mortgage banking company operating throughout the United States and Canada. Accredited originates, finances, securitizes, services and sells sub-prime mortgage loans secured by residential real estate.[1] The company focuses on borrowers who may not qualify for loans from traditional banking entities due to higher loan-to-value ratios, the nature (or absence) of income documentation, limited credit histories, high levels of debt or credit problems. (CCC ¶ 21.)

The REIT, an indirect subsidiary of Accredited and Accredited Home Lenders, Inc. ("AHL"—itself a subsidiary of Accredited), is a Maryland real estate investment trust. Unlike Accredited, the REIT does not originate mortgage loans. Instead, the REIT acquires mortgage assets—primarily residential mortgage loans, or interests in such loans, that AHL originated or acquired—and assumes related funding obligations from AHL. AHL holds all of the outstanding common stock in the REIT; preferred stock in the REIT was offered to the general public and traded on the New York Stock Exchange. AHL is excluded from, but purchasers of the REIT's preferred shares are included in, the proposed class. (CCC ¶ 22.)

Plaintiff's Complaint names five individual defendants who were executives at Accredited and/or the REIT. Defendant James A. Konrath was a founder of Accredited and at all relevant times was Chairman of the Board and Chief Executive Officer ("CEO") of Accredited. (*Id.*

¶ 23.) Konrath also served as CEO and Chairman of the REIT during the class period. (*Id.*) Defendant Joseph J. Lydon was at all relevant times President and Chief Operating Officer ("COO") of Accredited as well as a member of Accredited's Board of Directors. (CCC ¶ 24.) During the class period Lydon also served as President and COO of the REIT. (*Id.*) Defendant Stuart D. Marvin joined Accredited in April of 2005 and at all relevant times was Executive Vice President of the company. (*Id.* ¶ 25.) During the class period, Marvin served as Executive Vice President and Secretary of the REIT and signed SEC filings on the REIT's behalf. (*Id.*) Defendant John S. Buchanan was Chief Financial Officer ("CFO") of Accredited and during the class period served as CFO of the REIT, in which capacity he signed SEC filings on the REIT's behalf. (*Id.* ¶ 26.) Defendant Jeff W. Crawford was Accredited's Director of Operations. (*Id.* ¶ 27.)

The five remaining individual defendants were during the class period members of Accredited's Board of Directors. Defendant Jody A. Gunderson has served as a director of Accredited since January of 2000. (CCC ¶ 359.) Gunderson is chairperson of the Audit Committee of Accredited's Board of Directors. (*Id.*) Defendant Richard T. Pratt has served as a director of Accredited since March of 2003. (*Id.* ¶ 360.) Pratt is a member of the Audit and Nominating and Corporate Governance Committees of Accredited's Board of Directors. (*Id.*) Defendant Gary Erick-

---

1. Loan origination is the process by which a lender obtains new loans and includes qualifying borrowers, appraising collateral, processing documents, loan underwriting, funding the loan and recording the debt onto title. (CCC ¶ 32.) Underwriting refers to the credit analysis preceding the granting of a loan, based on information furnished by the prospective borrower, a credit report and the lender's evaluation of the individual's credit needs and ability to pay. (*Id.* ¶ 33.) Securitization of a loan is a form of structured finance in which pools of loans are packaged and sold to an independent entity that raises money to finance such purchase by issuing notes or other securities backed by the pool of loans. (*Id.* ¶ 36.)

son has served as a director of Accredited since March of 2003. (*Id.* ¶ 361.) Defendant Bowers W. Espy has served as a director of Accredited since July of 2004. (*Id.* ¶ 362.) Finally, Defendant James H. Berglund has served as a director of Accredited since September 1999. (*Id.* ¶ 363.)

## B. Defendants' Alleged Fraudulent Scheme and False Statements

The gravamen of Plaintiff's Complaint is that Defendants concealed Accredited's true financial condition and made materially false and misleading statements regarding the company's operations and income, as a result, artificially inflated the price of Accredited's stock during the class period. When the true financial condition of the company ultimately was disclosed Accredited's stock price decreased precipitously, closing at $3.97 per share on the day after the class period.

Accredited was founded in 1990 in San Diego and became publicly owned in 2003. (CCC ¶ 30.) Accredited operated via a wholesale unit, which did business through 15 offices and originated loans through a network of mortgage brokers, and a retail unit, which operated through numerous offices and originated loans directly to borrowers. (*Id.* ¶ 31.) In the years prior to the class period, the sub-prime mortgage lending industry experienced rapid growth. (CCC ¶ 42.) Accredited expanded at an even faster rate and the total volume of loans the company originated increased from $1.517 billion in 2000 to $12.4222 billion in 2004. (*Id.*) The company's stock experienced a similar increase and traded at more than $50 per share for much of the class period. (*Id.* ¶ 14.)

To fund the mortgage loans it originated, Accredited generally borrowed funds from warehouse lenders. This debt incurred by Accredited would then be securitized by the very loans Accredited originated using the borrowed funds. Under the terms of Accredited's lending agreements with these warehouse lenders, when loans serving as collateral lost value the lender could make a margin call requiring Accredited to pay cash back to the lender. (*Id.* ¶ 34.) After originating a loan, Accredited would either securitize or sell the loan to generate revenue and/or pay down the debt incurred under Accredited's credit facilities. (*Id.* ¶ 35.) In connection with these transactions, Accredited provided purchasers of its loans with representations and warranties regarding the underwriting standards used by Accredited in originating loans. (*Id.* ¶ 37.) If the purchaser determined that Accredited violated these representations and warranties, or if a borrower defaulted during the early months of the loan, the purchaser could require Accredited to repurchase the loan. (*Id.*)

### 1. Defendants' Alleged False and Misleading Statements Regarding Accredited's Underwriting Standards

Prior to the class period, Defendants allegedly represented that Accredited was focused more on credit quality than merely increasing the volume of loans it originated and that Accredited's underwriting procedures were better and more conservative than those of other sub-prime mortgage lenders. (CCC ¶¶ 38, 39, 171, 172.) These representations were allegedly relied on by analysts, who recommended that investors buy Accredited's stock, *e.g.* ¶¶ 177–78, as well as by entities that purchased loans originated by Accredited, who did not review the great majority of loans purchased from Accredited because default rates were at historic lows as home prices increased and because they knew they could require Accredited to buy back any loans that did not comply with Accredited's underwriting standards. (*Id.* ¶¶ 40, 44.)

By the beginning of the class period on November 1, 2005, however, Defendants allegedly caused Accredited's employees to disregard the company's stated underwriting guidelines in an effort to increase the volume of loans originated by Accredited. (*Id.* ¶ 45.) The Complaint contains the allegations of several confidential witnesses who detail pervasive, widespread exceptions to the Company's underwriting policies and substantial pressures to approve such loans at the end of reporting periods in an effort to meet financial projections. (*Id.* ¶ 48.) According to the allegations of the Complaint, the individual defendants were not only aware of these practices but affirmatively mandated and/or encouraged them. (*E.g., id.* ¶¶ 63, 78, 89–96.) Publicly, however, Defendants allegedly continued to represent that Accredited was committed to a disciplined approach that focused on credit quality even though Defendants knew that they had caused the company to abandon adherence to its underwriting policies. (*See* CCC ¶¶ 174–75, 187.) Additionally, Accredited's Form 10–Q for the third quarter of 2005 allegedly falsely stated that the company was in compliance with all covenant requirements for each of Accredited's credit facilities. (*Id.* ¶ 180.) Analysts and investors including plaintiffs allegedly relied on these false statements by Defendants, and as a result Accredited's stock price increased. (*See id.* ¶¶ 179, 189.)

### 2. *Defendants' Alleged Manipulation of Reserve Amounts*

Plaintiffs Complaint alleges that Defendants manipulated Accredited's earnings in several respects including by violating accounting rules and regulations. (*See* CCC ¶ 97.) As a result, Accredited issued financial statements that were materially misleading and not presented in accordance with generally accepted accounting principles ("GAAP"). (*See id.*) Addition-

ally, Defendants during the class period allegedly made numerous false and misleading statements regarding Accredited's earnings and projected future earnings.

First, the Complaint alleges that Defendants manipulated earnings by inadequately reserving for defaults on mortgage loans held by the company for investment. (CCC ¶¶ 100–111.) Through its subsidiary the REIT, Accredited securitized mortgage loans originated by AHL. (*Id.* ¶ 100.) According to SEC filings by Accredited, these securitization transactions are "structured legally as sales, but for accounting purposes are treated as financings." (*Id.*) Statement of Financial Accounting Standards ("SFAS") No. 140 requires that loans transferred to a third party that do not qualify for sale treatment be reflected on the balance sheet as secured borrowings. (*Id.* ¶ 101.) GAAP required Accredited to establish a reserve for potential credit losses on such mortgage loans held for investment ("MLIs") when the underlying borrowers default on their obligation to make mortgage payments. (*Id.* ¶ 102.) This reserve is referred to as an allowance for loan losses ("ALL").

According to guidance provided by the SEC, loan loss allowance methodologies must "incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process." (CCC ¶ 103.) In SEC filings, Accredited stated that it established the amount of its ALL by segmenting its loan portfolio by contractual delinquency status and then applying the company's historical loss experience and other analytical tools to determine the reasonableness of the ALL amount. (*Id.* ¶ 105.) During the class period, when Defendants caused Accred-

ited to deviate from its own underwriting guidelines, the Complaint alleges that GAAP required a commensurate increase in Accredited's ALL to reflect the decreasing credit quality of the loans originated by the company. (*Id.* ¶ 107.) Instead of increasing, however, beginning with the third quarter of 2005 Accredited's ALL allegedly decreased as a percentage of the company's delinquent loans (and despite the fact that the amount of MLI was increasing due to the higher volume of loan origination). (*Id.* ¶¶ 107–110.) The Complaint alleges that by the end of the class period Defendants' understatement of the company's ALL totaled hundreds of millions of dollars and that this understatement caused Accredited's reported pre-tax income to be overstated by a commensurate amount. (*Id.* ¶ 111.)

Second, the Complaint alleges that Defendants manipulated Accredited's earnings by inadequately reserving for real estate owned ("REO") by the company.[2] (CCC ¶ 112–123.) Under accounting principles similar to those discussed above in connection with the ALL, Accredited was required to maintain a reserve ("REO reserve") for potential losses on the eventual sale of REO assets. The Complaint alleges that prior to the class period Accredited maintained an REO reserve of greater than 40% of the company's gross REO. (*Id.* ¶ 116.) Throughout the class period increased defaults and foreclosures caused Accredited's gross REO to increase significantly. (*Id.* ¶ 112.) Defendants failed to proportionately increase the REO reserve, however, and instead allegedly decreased

the reserve as a proportion of gross REO. (*Id.; see id.* ¶ 116.) By allegedly understating the company's REO reserve in at least three reporting periods, Defendants falsely and misleadingly inflated Accredited's reported net income by $19.13 million in the fourth quarter of 2006.[3] (*Id.* ¶ 122.) When Accredited finally filed (on August 2, 2007, and therefore after the class period here) audited financial statements for full-year 2006, the company increased the REO reserve from $27.275 million, as it previously had reported, to $40.36 million. (*Id.* ¶ 123.)

Next, Defendants allegedly manipulated earnings by inadequately reserving for repurchase losses on mortgage loans sold to third party investors. (CCC ¶¶ 124–38.) When Accredited sold a mortgage loan to a third party it recognized a gain or loss (depending on whether the sale proceeds exceeded the book value of the loan) resulting from that sale. (*Id.* ¶ 125.) Again under accounting principles similar to those described above, Accredited was required to maintain on its balance sheet a reserve account for potential future losses and expenses incurred when Accredited was required to repurchase a loan, which the company was forced to do if the underlying borrower defaulted or if the loan was originated in violation of Accredited's underwriting representations and warranties. (*Id.* ¶¶ 126–28.) As with the ALL, *supra,* SFAS No. 140 stated that the reserve must be estimated using factors such as the company's historical repurchase experience, industry repurchase experience, projections regarding the future volume of

---

**2.** Accredited generally sold to third parties the mortgage loans it originated. However, under some circumstances that third party could require Accredited to repurchase the loan. Ordinarily Accredited would then try to re-sell such a loan in the so-called "scratch and deny" market but, if it could not do so, Accredited would foreclose on the loan and

acquire the property serving as collateral for the loan. (*See* CCC ¶¶ 113–15.)

**3.** This figure takes into account an allegedly understated REO reserve, and therefore inflated net income, in at least two prior quarters. (CCC ¶¶ 121–22.)

repurchases and the expected value of the underlying property serving as collateral. (*Id.* 129.) GAAP required the reserve to be estimated and recorded on Accredited's balance sheet in the period in which the loans are sold. Accordingly, the amount reserved affected Accredited's reported income by reducing (in direct proportion to the amount reserved) Accredited's gain on loan sales. (*Id.* ¶ 130.)

The Complaint alleges that Defendants caused Accredited to maintain an inadequate reserve for repurchase losses. (CCC ¶ 131.) Because Accredited allegedly deviated from its own underwriting guidelines, during the class period the company allegedly originated loans to an increasing number of borrowers that could be expected to default and by 2006 the company in fact was beginning to be forced to repurchase a growing number of loans. (*Id.* ¶ 132, 134.) Defendants allegedly violated GAAP by failing to substantially increase Accredited's reserve for repurchases to reflect the declining quality of Accredited's loan portfolio. (*Id.*) As a result, Defendants caused Accredited's reported income to be artificially inflated. (*Id.* ¶ 135.) Like the REO reserve, *see supra,* when Accredited ultimately released its audited financial statements for full-year 2006, the company increased its reserve for repurchases from the $26.8 million that it reported during the class period to $43.881 million. (*Id.* ¶ 138.) Therefore, Plaintiffs Complaint alleges, the unaudited disclosure made during the class period was falsely and misleadingly understated. (*Id.*) According to the allegations of 28 the Complaint, the cumulative effect of Defendants' understatement of the three reserve accounts (ALL reserve, REO reserve and repurchase reserve) was to falsely and misleadingly overstate Accredited's pre-tax income by $631.66 million. (*Id.* ¶ 140.)

### 3. *Alleged Improper Accounting for the Aames Acquisition*

Finally, the Complaint alleges that Defendants manipulated earnings by improperly accounting for Accredited's acquisition of Aames. (CCC ¶¶ 141–50.) Accredited agreed to acquire Aames on May 24, 2006. The transaction, in which Accredited paid to Aames shareholders $77.6 million in cash and 4.4 million shares of Accredited stock, was consummated on October 1, 2006. (*Id.* ¶ 142.)

The Complaint alleges that GAAP required Accredited to record on its balance sheet goodwill based on the merger's valuation on or within "a few days before and after" the date the transaction is agreed to and announced. (*Id.* ¶ 143.) On the date the merger was announced, Accredited's stock closed at $51.94 per share, resulting in a transaction valued at approximately $329.5 million, $235.528 million of which was in stock. (*Id.* ¶ 142.) Accredited, however, recorded goodwill based on its stock price on October 1, 2006 (the date the transaction was consummated). (*Id.* ¶ 145.) Accredited's stock price on that date was $19 per share less than on the date the transaction was announced and, as a result, Accredited recorded approximately $63 million of goodwill. (*Id.*) Under GAAP, the Complaint alleges that Accredited should have recorded approximately $142 million in goodwill. (*Id.*) Had the company done so, it also would have been required to write-down that goodwill to zero in the fourth quarter of 2006. (*Id.* ¶ 148.) The result of this write-down would have been to decrease the company's assets and earnings by $142.4 million. Accredited's failure to recognize the entire amount of goodwill, therefore, allegedly caused the company's reported financial results for 2006 to be false and misleading during the class period. (*Id.* ¶ 150.) This alleged accounting violation also allegedly

caused Accredited to be unable to timely file its Form 10–K, which in turn caused Accredited to be in violation of covenants in its lending agreements. (*Id.* ¶ 149.)

## C. Plaintiff's Claims for Relief

Plaintiffs Complaint alleges seven claims for relief under the federal securities laws. For purposes of Defendants' motions to dismiss Plaintiffs claims may be divided as follows: (1) claims against defendants Accredited, the REIT, Konrath, Lydon, Buchanan, Marvin and Crawford for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and the rules and regulations promulgated thereunder, including SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"); (2) claims against defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy, Berglund and Marvin for violations of Section 14(a) of the Exchange Act and SEC Rule 14a–9; and (3) claims against defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy and Berglund for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act").

### Discussion

## A. Defendants' Motions to Dismiss— Legal Standards

Rule 12(b) (6) of the Federal Rules of Civil Procedure permits dismissal of a claim either where that claim lacks a cognizable legal theory, or where insufficient facts are alleged to support plaintiffs theory. *See Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). In resolving a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996). However, as stated recently by the Supreme Court, to survive a Rule 12(b)(6) motion a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007); *see Kennedy v. Natural Balance Pet Foods, Inc.,* 2007 WL 2300746, *1 (S.D.Cal.2007) (plaintiff must plead sufficient facts to raise right to relief above speculative level). A plaintiffs obligation under Rule 8(a)(2) "to provide the grounds of his entitlement to relief requires more than labels and conclusions . . . ." *Id.* Although a complaint need not set forth "detailed factual allegations" it must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1964, 1974. If a complaint is found to fail to state a claim, courts generally grant leave to amend unless the pleading could not possibly be cured by the allegation of other facts. *See Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995).

### 1. *Falsity and Scienter*

Claims for violations of the federal securities laws, however, are subject to additional pleading requirements imposed by the Private Securities Litigation Reform Act of [year] ("PSLRA").[4] The PSLRA dictates that a securities complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). The Ninth Circuit

---

4. Rule 9(b) of the Federal Rules of Civil Procedure, which imposes a heightened pleading standard on claims sounding in fraud, also applies to some of Plaintiff's claims. *Yourish v. Cal. Amplifier,* 191 F.3d 983, 993 (9th Cir. 1999) (noting applicability of Rule 9(b) to securities fraud I claims); *see Desaigoudar v.*

*Meyercord,* 223 F.3d 1020, 1023 (9th Cir. 2000) ("The PSLRA modifies Rule 9(b)"). The Court concludes that to the extent Plaintiff has satisfied the strictures of the PSLRA, the Complaint also is sufficient under Rule 9(b).

traditionally analyzes the overlapping requirements of falsity and scienter at the same time. *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001) (pleading requirements of PSLRA may be collapsed into single inquiry because analysis of both factors involves same facts); *see No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 932 (9th Cir.2003). A securities fraud claim must "state with particularity facts giving rise to a strong inference" that each defendant acted with the intent to defraud or with deliberate recklessness. 15 U.S.C. § 78u–4(b)(2); *America West*, 320 F.3d at 931; *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 979 (9th Cir.1999) ("deliberate or conscious recklessness").

As the Ninth Circuit has recognized, "an inevitable tension arises between the customary latitude granted [to] the plaintiff on a motion to dismiss under Fed. R.Civ.P. 12(b)(6), and the heightened pleading standard set forth under the PSLRA." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir.2002). The Court accepts as true the allegations of Plaintiff's Complaint; however, with respect to the element of scienter, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Id.* at 897. The PSLRA requires a court to "review[ ] the complaint in its entirety to determine whether the totality of facts and inferences demonstrate a strong inference of scienter." *Id.* at 895.

**B. First and Second Claims for Relief—Section 10(b) of the 1934 Act and Rule 10b–5**

Plaintiffs first claim for relief alleges that all defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. (CCC ¶¶ 312, 318.) Plaintiff's second claim asserts controlling person liability against

several defendants for the primary violations alleged by Plaintiff's first claim. (*Id.* ¶ 326.)

**1. *Section 10(b) and Rule 10b–5***

■ To state a claim under Section 10(b) of the Securities Exchange Act, a plaintiff must allege "(1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff justifiably relied (5) that proximately cause[d] the alleged loss." *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir.1999). The PSLRA requires a plaintiff to plead allegedly false or misleading statements by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); *see Desaigoudar*, 223 F.3d at 1023

**(a) *False and Misleading Statements***

■ Plaintiff's complaint alleges that Accredited's financial results and projections were rendered false and misleading by Defendants' alleged manipulation of reserves and other accounting violations, and that Defendants' statements regarding Accredited's underwriting practices were allegedly false and misleading because Defendants had caused Accredited to deviate from the company's publicly professed standards. The Court concludes that with respect to both of these theories Plaintiff has adequately alleged false and misleading statements and the reasons those statements were false and misleading. Since Plaintiff has asserted this claim against all defendants, however, the Court must consider whether the Complaint adequately alleges false and misleading statements made by, or properly attributable to, each defendant.

After careful review of Plaintiff's Complaint, the Court concludes that sufficient allegations exist against Accredited itself

as well as individual defendants Konrath, Lydon, Marvin, Buchanan and Crawford on the allegations of accounting improprieties. As a result of the alleged accounting improprieties, statements during the class period regarding Accredited's financial results or projections were rendered false and misleading. These statements were made in press releases by Accredited as well as conference calls hosted by Accredited's executives for reporters and analysts. (*E.g.,* CCC ¶¶ 174–75, 184, 191.) The Ninth Circuit has held that it is "reasonable to presume" that false or misleading information conveyed in "prospectuses, registration statements, annual reports, press releases, or other 'group-published information ... are the collective action of the corporate officers.'" *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1441–42 (9th Cir.1987) Accordingly, Plaintiff's Section 10(b) and Rule 10b–5 claim is properly pled with respect to defendants since those defendants served as Accredited's executives and had direct involvement with the company's day-to-day affairs and financial statements.

■■■ This presumption, however, does not necessarily extend to a company's outside directors. With respect to these defendants, a plaintiff must allege that they participated in the corporation's day-to-day activities or communicated specific information at a particular time. *See In re Stac Electronics Securities Litig.,* 89 F.3d 1399, 1410–11 (9th Cir.1996). Plaintiffs Complaint does not allege specific false or misleading statements by the director defendants and fails to establish any basis for attributing statements made by Accredited or its executives to the company's outside directors. Similarly, Plaintiff's Complaint provides no basis to impose liability on those individuals based on their participation in an alleged fraudulent scheme to artificially inflate Accredited's stock price. The same is true for the REIT, as Plaintiff's Complaint fails to allege any false

statements made by that entity. Accordingly, with respect to the REIT and individual defendants Gunderson, Pratt, Erickson, Espy and Berglund, the Court grants Defendants' motion to dismiss Plaintiff's claim under Section 10(b) and Rule 10b–5.

### (b) *Materiality*

■■■ The Court concludes that the false and misleading statements discussed above were material. The alleged manipulation of reserves and inappropriate accounting for the Aames acquisition caused Accredited to overstate its pre-tax income during the class period by millions of dollars. (*See* CCC ¶¶ 111, 122, 138.) Although Defendants' allegedly false and misleading statements regarding Accredited's underwriting policies are not as easily quantified, as a mortgage lender, Accredited's underwriting practices would be among the most important information looked to by investors. The significance of this information is illustrated by the frequency with which Defendants emphasized Accredited's underwriting policies in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements regarding the company's standards. (*E.g.,* CCC ¶¶ 176, 178.)

### (c) *Scienter*

■■■ To state a claim under Section 10(b), a plaintiff must allege facts giving rise to a strong inference that the defendants acted knowingly or with deliberate recklessness. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004). The Supreme Court recently held that a Section 10(b) plaintiff "must plead facts rendering an inference of scienter at least as likely as any plausible apposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* —— U.S. ——, 127 S.Ct. 2499, 2513, 168

L.Ed.2d 179 (2007). Here, the Court concludes that an inference of scienter is sufficiently supported by the Complaint's allegations regarding the frequency with which Defendants caused Accredited's underwriters' decisions rejecting risky loans and the degree to which Accredited's reserves were decreased compared to historic levels, at a time when according to generally accepted accounting principles such reserves should have been increased.

■ Plaintiff's Complaint alleges in detail that Defendants during the class period knew about Accredited's deviation from the company's underwriting standards and that Defendants' therefore knew their public statements regarding Accredited's compliance with those standards were false and misleading. "The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund. Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir.2004). Plaintiff's Complaint details how Accredited utilized sophisticated software for tracking and analyzing data regarding management overrides of underwriters' and appraisers' decisions rejecting loans. (CCC ¶¶ 49, 62, 76, 78, 91.) Prior to the class period, Accredited implemented a system specifically to monitor management overrides of underwriters' rejections of loans for failing to comply with the company's underwriting criteria. (*Id.* ¶ 62.) The five individual defendants who were executives of Accredited allegedly had access to periodic reports that included detailed information regarding widespread deviations from company policy and the adverse effect such practices were beginning to have on Accredited. Moreover, drawing on the allegations of several confidential witnesses, the Complaint alleges with specificity that Defendants actually directed these deviations from company policy. (*Id.* ¶¶ 45–88.) Numerous former employees assert that their managers pressured them to approve loans that did not comply with the company's own policies for the purpose of increasing loan volume and reporting earnings consistent with (or exceeding) analysts' expectations. (*Id.* ¶¶ 51, 57, 61, 63, 70, 85.)

■ "Violations of GAAP standards can also provide evidence of scienter." *In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. 2005). The Complaint alleges with particularity significant violations of GAAP that affected several of the company's reserve accounts and occurred around the same time period, (*See* CCC ¶¶ 107 (ALL reserve), 112 (REO reserve), 131–32 (MLI reserve).) In light of Defendants' alleged awareness that the company had begun to deviate from its own underwriting policies and that the quality of the company's loan portfolio would begin to decrease, the fact that Defendants allegedly caused or permitted large decreases in several significant reserve accounts which would have been impacted by these changes also supports an inference of scienter. Although the determination of reserve amounts involves a certain degree of judgment and prediction, the same is not true for the GAAP principles regarding accounting for goodwill in connection with an acquisition, which Defendants also allegedly violated. (*Id.* ¶ 145.)

The sizable impact on Accredited's reported earnings of these alleged violations of GAAP also supports an inference of scienter. *In re Daou Systems, Inc.*, 411 F.3d 1006, 1022 (9th Cir.2005). The Court also notes that Accredited's auditor during the class period refused to approve the company's 2006 financial statements before the deadline to file the company's Form 10–K, and that the company's new auditor required the reserves for loan losses to be retroactively increased by over $30 million.

(CCC ¶¶ 123, 138, 294.) Defendants were financially sophisticated as well as experienced in the mortgage industry and, although Defendants argue that they reasonably believed Accredited's reserves to be adequate, the Court concludes that the facts alleged in Plaintiff's Complaint sufficiently support an inference of scienter to survive a motion to dismiss.

#### (d) *Reliance and Causation*

A Section 10(b) claim requires a plaintiff to allege that the plaintiff purchased stock in reliance on the defendants' alleged misrepresentations and that the defendants' misrepresentation or other fraudulent conduct proximately caused the plaintiffs economic loss. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). As stated by the Supreme Court this requirement, which "should not prove burdensome for a plaintiff," may be satisfied by alleging (1) that the plaintiff paid an artificially inflated price for the company's stock and (2) that the stock price fell "after the truth became known" regarding the defendant's misrepresentations. *Id.*

The Court concludes that this Complaint satisfies those requirements. First, the Complaint alleges that Plaintiff and the other members of the putative class purchased Accredited stock in reliance on the specific statements of Defendants as well as the integrity of the market price for Accredited's shares, which were publicly traded in large volumes on an efficient market. (CCC ¶¶ 304, 307.) Second, the Complaint alleges that Accredited's stock was artificially inflated during the class period due to accounting improprieties that had the effect of overstating the company's earnings and false and misleading statements concerning the company's lending practices. (*Id.* ¶ 316.) Finally, Plaintiff asserts that Accredited's stock price declined significantly when the truth was disclosed regarding Accredited's undisciplined lending practices. (*Id.* ¶ 308.)

#### 2. *Control Person Liability*

Plaintiff's second claim for relief alleges that Accredited as well as individual defendants Konrath, Lydon, Buchanan, Marvin and Crawford violated Section 20(a) of the Exchange Act. (CCC ¶¶ 319–26.) "Section 20(a) [of the Exchange Act] provides joint and several liability for controlling persons who aid and abet violations of the 1934 Act absent a finding of good faith and lack of inducement." *America West*, 320 F.3d at 945; 15 U.S.C. § 78t(a). In order to plead control person liability, a plaintiff must allege (1) a primary violation of the securities laws and (2) "that the defendant exercised actual power or control over the primary violator." *America West*, 320 F.3d at 945 (internal quotations omitted). Scienter is not an element of control person liability; instead, a defendant may assert the affirmative defense of good faith by establishing the absence of scienter. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000). Here the first element is satisfied because, as discussed above, Plaintiffs complaint has adequately alleged a primary violation by Accredited under Section 10(b) and Rule 10b–5.

The Court concludes that Plaintiffs Complaint alleges that defendants Konrath, Lydon, Buchanan, Marvin and Crawford exercised sufficient control over Accredited to state a claim against those individuals for secondary liability for the alleged primary violations by Accredited. The Complaint asserts that these individual defendants, all of whom were executives of Accredited, "by virtue of [their] position[s] with Accredited and [their] specific acts," were controlling persons of Accredited. The Complaint alleges that each defendant possessed control over the

company's day-to-day operations, lending practices and reporting to investors, and exercised that control to cause Accredited to engage in the alleged primary violations under Section 10(b). (CCC ¶¶ 321 (Konrath); 322 (Lydon); 323 (Marvin); 324 (Buchanan); 325 (Crawford).) With respect to Accredited itself, however, this claim must be dismissed. The only entity controlled by Accredited is its subsidiary the REIT, and Plaintiff's Complaint does not state a claim for a primary violation by the REIT.

## C. Third Claim for Relief—Section 14(a) of the 1934 Act and Rule 14a-9

[15–17] Plaintiff's third claim for relief [5] centers on the Joint Proxy Statement and Prospectus ("Proxy Statement") that was distributed to Accredited's and Aames's shareholders in connection with the proposed acquisition of Aames by Accredited. (CCC ¶ 328.) Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a–9 promulgated thereunder, 17 C.F.R. § 240.14a–9, prohibit the solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading. *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir.2000); *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.14a–9. In addition to establishing one of those elements a plaintiff "must demonstrate that the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction." *Desaigoudar*, 223 F.3d at 1023. Like Plaintiff's Section 10(b) and Rule 10b–5 claim, a claim under Section 14(a) and Rule 14a–9 sounds in fraud and therefore Rule 9(b) of the Federal Rules of the Civil Procedure and the PSLRA require a plaintiff to plead such a claim "with a high degree of meticulousness." *Id.*

The Court concludes that Plaintiff has adequately alleged that the Proxy Statement contained at least one false and misleading statement or omission. The Proxy Statement included several allegedly false and misleading statements that are similar to those on which Plaintiff's Section 10(b) claim is based.[6] First, the Proxy Statement included pro forma financial information purporting to show financial results for 2005 and the first quarter of 2006 for the company that would result from the Accredited/Aames merger. (CCC ¶ 333.) Second, the Proxy Statement stated that Accredited employed "appropriate underwriting policies" and that Aames' higher historical delinquency rates were "due to the lower credit quality of its typical borrower as compared to Accredited's." (*Id.* ¶ 338.) Although Defendants seize on the Proxy Statement's disclosures that "[i]f Accredited's competitors adopt less stringent underwriting standards, it will be pressured to do so as well," *see* CCC ¶ 338, and that the company could not "assure ... that certain employees will not deliberately violate its lending policies," *id.* ¶ 339, the Court agrees that the Proxy Statement nonetheless may have been false and mis-

---

5. The Complaint asserts this claim against Accredited as well as individual defendants Konrath, Lydon, Marvin, Gunderson, Pratt, Erickson, Espy and Berglund, all of whom were directors of Accredited when the Proxy Statement was approved. With the exception of Marvin, who as Secretary of Accredited's Board of Directors signed the Proxy Statement on behalf of the entire board, the above-named individual defendants all signed the S–

4 Registration Statement that contained the Proxy Statement allowing it to be filed with the SEC. (CCC ¶ 329.)

6. As the individual defendants recognize, Plaintiff's Section 14(a) claim is effectively indistinguishable from the Section 10(b) claim. (Indiv. Defs.' and Director Defs.' Reply ISO Motion to Dismiss at 16–17.)

leading to the extent it omitted to disclose that Accredited already had begun to systematically violate its own lending policies.

For the same reasons discussed in connection with Plaintiff's claim under Section 10(b), the Court concludes that with respect to Accredited and individual defendants Konrath, Lydon and Marvin the Complaint adequately alleges the requisite degree of scienter. Although Plaintiff's Complaint avers that the outside directors Gunderson, Pratt, Erickson, Espy and Berglund signed the S–4 Registration Statement, the Complaint fails to allege facts from which the Court can draw an inference of scienter as to those defendants regarding the allegedly false statements contained in the Proxy Statement. The Complaint does not allege that the outside directors either caused or had knowledge of the alleged accounting improprieties, and it is similarly devoid of allegations that those individuals had knowledge of the company's alleged deviations from its underwriting policies. Accordingly, the Court dismisses defendants Gunderson, Pratt, Erickson, Espy and Berglund from Plaintiff's third claim for relief.

## D. Fourth Claim for Relief—Section 11 of the 1933 Act

Plaintiff Kornfeld, on behalf of himself and the other members of the putative class who acquired Accredited stock in exchange for Aames stock, alleges that defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy and Berglund violated Section 11 of the Securities Act of 1933. (CCC ¶ 345.) Section 11 creates a private remedy against certain individuals when any part of a registration statement, when it became effective, contains an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not mis-

leading. 15 U.S.C. § 77k(a). "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *In re Stac Electronics Securities Litig.*, 89 F.3d at 1404. Among the individuals potentially liable under Section 11 are; "every person who signed the registration statement" and "every person who was a director of . . . the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted." 15 U.S.C. § 77k(a)(*l* )-(2). The Complaint alleges that all individual defendants against whom this claim is asserted signed the registration statement and were directors of Accredited at the time that statement was filed with the SEC. (CCC ¶ 346.) Although the factual allegations relating to this claim are set forth in a separate portion of the Complaint, the alleged false and misleading statements and/or omissions contained in the registration statement are substantially the same as those which form the basis of Plaintiff's claims under Sections 10(b), 14(a) and 12(a)(2). For the reasons discussed in connection with the sufficiency of those claims, the Court concludes that Plaintiff has adequately alleged a claim under Section 11.

## E. Fifth Claim for Relief—Section 15 of the 1933 Act

The fifth claim asserted by the Complaint is derivative of the Complaint's fourth claim. (CCC ¶ 345.) Plaintiff Kornfeld, on behalf of himself and the other members of the putative class who acquired Accredited stock in exchange for Aames stock, alleges that defendants Konrath and Lydon are secondarily liable for Accredited's alleged violation of Section 11. *See* 15 U.S.C. § 77o. As discussed above, the Court concludes that the Complaint sufficiently alleges that Konrath and Lydon, by virtue of their respective positions

as Accredited's CEO and President/COO, qualify as controlling persons of the company. Since the Court has concluded that the Complaint adequately alleges a primary violation by Accredited of Section 11, the Court denies Defendants' motion to dismiss Plaintiffs fifth claim for relief.

### F. Sixth and Seventh Claims for Relief—Section 12(a)(2) of the 1933 Act

■ Lead Plaintiff ATRS and plaintiff Kornfeld, on behalf of themselves and the other members of the putative class who acquired Accredited stock in exchange for Aames stock, allege that defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy, Berglund and Marvin violated Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 771(a)(2), against. (CCC ¶ 408.) The Complaint also pleads a claim against defendants Konrath and Lydon as controlling persons who are liable for the other defendants' alleged Section 12(a)(2) violation under Section 15 of the Securities Act, 15 U.S.C. § 77o. (*Id.* ¶ 408.)

"Section 12(a) (2) of the 1933 Securities Act imposes civil liability on any person for use of any instrumentality of interstate commerce to offer or sell securities by means of a prospectus or oral communication that includes an 'untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.' " *In re Daou Systems, Inc.,* 411 F.3d at 1028–29 (quoting 15 U.S.C. § 77(a)(2)). The Ninth Circuit has stated that, to establish liability under Section 12(a)(2), "a plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchase of the securities for their own financial gain." *Id.* at 1029. The plaintiff must also demonstrate dam-

ages. *Id.* "Causation, however, is not a necessary element of a prima facie case under section 12." *Id.*

Although set out in a separate portion of the Complaint, Plaintiff's Section 12 claim is based on the same Proxy Statement that was distributed to Accredited's and Aames's shareholders in connection with the proposed acquisition of Aames by Accredited and that formed the basis of Plaintiff's claim under Section 14(a) of the 1934 Act. (CCC ¶¶ 388–403, 407–414.) The Complaint asserts that by use of that Proxy Statement, which contained several allegedly false and misleading statements or omissions of material fact, Accredited exchanged its common stock for the Aames stock owned by the plaintiffs who compose the putative class with respect to this claim. (*Id.* ¶ 410) The Court concludes that Plaintiffs Section 12(a) claim is deficient with respect to the individual defendants. With respect to individual defendants Gunderson, Pratt, Erickson, Espy and Berglund the Court concludes that the Complaint's Section 12(a) claim suffers from the same defect as Plaintiff's claims under Section 10(b)and 14(a). Because the Complaint fails to allege a factual basis for attributing any false or misleading statements to those individuals or for inferring that they possessed the requisite level of scienter, those defendants are dismissed from Plaintiff's Section 12(a) claim. Although the Complaint sufficiently alleges false or misleading statements made with scienter by defendants Konrath, Lydon and Marvin, the Complaint fails to allege that plaintiffs exchanged their Aames shares for Accredited stock held by those executives, or that the executive defendants solicited the exchange "for their own financial gain." *See In re Daou Systems, Inc.,* 411 F.3d at 1029; *Pinter v. Dahl,* 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (plaintiff under Section 12(a)(2) must allege that defen-

dants solicited purchase of securities "motivated at least in part by a desire to serve his own financial interests").

The Court concludes that the Complaint adequately pleads a claim under Section 12(a)(2) against Accredited. Accordingly, for the reasons stated above in connection with Plaintiff's claims under Section 10(b) the Complaint states a claim against individual defendants Konrath and Lydon as controlling persons secondarily liable under Section 15(a) for the primary violation of Accredited. *See* 15 U.S.C. § 77o; *In re Daou Systems, Inc.*, 411 F.3d at 1029.

### G. Defendants' Request For Judicial Notice

 Defendants have requested that the Court take judicial notice of 54 documents, many of which are filings with the Securities and Exchange Commission ("SEC"). (Doc. No. 76 ("Defs.' Joint RJN").)[7] On a Rule 12(b)(6) motion to dismiss the Court generally cannot consider matters outside the complaint, with two exceptions: (1) authenticated documents that have been incorporated into the complaint and (2) facts that are subject to judicial notice. *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir.2001). For the following reasons, the Court grants Defendants' request for judicial notice in its entirety.

The majority of Defendants' request for judicial notice concerns excerpts from documents that have been publicly filed with the SEC. (*See* Defs.' Joint RJN, Exs. A–TT.) Because Plaintiffs' CCC frequently quotes from or refers to documents filed with the SEC, *e.g.*, CCC ¶¶ 36, 89, 92, the Court concludes that the underlying documents have been incorporated by reference into Plaintiffs' CCC and may be considered in the context of Defendants' Rule 12(b)(6) motions. *In re Silicon Graphics, Inc. Securities Litig.*, 183 F.3d 970, 986 (9th Cir.1999). Similarly, the Court also grants Defendants' request with respect to Exhibits UU and VV because petitions for Chapter 11 bankruptcy are publicly filed documents. *See Biggs v. Terhune*, 334 F.3d 910, 916 n. 3 (9th Cir.2003). Exhibits WW through ZZ are a transcript of an Accredited conference call regarding 2006 fourth quarter earnings, as well as various research reports. (*See* RJN Exs. WW–ZZ.) Because Plaintiffs' CCC quotes from or refers to these documents, *see* CCC ¶¶ 46; 301, the Court concludes it is appropriate to take judicial notice of the entire statements. The remaining two documents that Defendants request the Court to judicially notice are LexisNexis Historical Quotes for Accredited's stock price during certain time periods. (Defs.' RJN Exs. AAA, BBB.) Plaintiffs do not object

---

**7.** In addition to the joint request for judicial notice, the defendants have submitted further documents extraneous to Plaintiffs complaint. First, attached to the declaration of Edward Patrick Swan, Jr., in support of the corporate defendants' motion to dismiss are (1) several newspaper articles regarding Accredited and/or the subprime mortgage market, (2) a transcript of remarks made by the chairman of the Federal Reserve Bank, and (3) various press releases and SEC filings of companies not defendants here. (Swan Decl., Exs. A–K.) Second, the individual defendants' motion to dismiss includes three appendices: a newspaper article similar to those submitted by the corporate defendants, and two tables appar-

ently created by counsel that purport to summarize "non-prime lending industry events" and to compare "forward-looking statements and risk disclosures."

The Court concludes that these documents, which are neither referenced in Plaintiff's complaint nor the subject of a proper request for judicial notice, may not be considered on a motion to dismiss. *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir.2001). The Court concludes that these extraneous documents are neither necessary nor appropriate on a motion to dismiss, and the Court has not considered them. The Court therefore denies as moot Plaintiffs motion to strike.

to judicial notice of these historical quotes, which the Court concludes are not subject to reasonable dispute and are capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned. *See* Fed.R.Evid. 201(b).

## Conclusion

To summarize, the Court denies the motions to dismiss except as follows:

1. The REIT and individual defendants Gunderson, Pratt, Erickson, Espy and Berglund are dismissed from Plaintiff's first claim for relief.

2. Individual defendants Gunderson, Pratt, Erickson, Espy and Berglund are dismissed from Plaintiff's third claim for relief.

3. All defendants except Accredited are dismissed from Plaintiff's sixth claim for relief.

The Court grants Plaintiff leave to amend the complaint to address the deficiencies identified by this Order. *See Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995) (leave to amend generally granted unless pleading could not possibly be cured by alleging other facts). Plaintiff may file an amended complaint within 30 days of the date this order is stamped "filed." The Court in its discretion grants Accredited leave to file its answer within 30 days after the filing by Plaintiff of an amended complaint.

IT IS SO ORDERED.